[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 496 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 497 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 499 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 500 
We have carefully examined the questions involved, and have arrived at the conclusion that the judgment must be affirmed, and we concur substantially with the views expressed in the prevailing opinion of the General Term.
It is found, as a fact, that the two bonds and mortgages in question were executed and delivered to the bank on the 12th day of October, 1867, to hold as collateral security for the payment of the entire debt, then owing the bank by Clinton, *Page 501 
amounting to $40,531.87, and the evidence of the president of the bank is sufficient to sustain this finding. The debt upon which the plaintiff was surety was included in this amount, and he, with the other sureties, had an equitable interest in the proper application of the securities, and a right to subrogation upon the payment by them of the debts. (2 J. Ch., 122.) For releasing and canceling the old mortgages, the bank may have incurred a liability to the Leonards, who, from the facts appearing in this case, had an interest therein as sureties for Clinton, but the relative rights of the Leonards and the bank, as between themselves, are not involved in this action, and cannot be considered. The arrangement under which these mortgages were given was different from that under which the prior mortgages were delivered and held. The Second National Bank received a benefit by this new arrangement, as the creditor of Clinton (aside from having them executed directly to itself, and thus, at least, saving the expense and trouble of an assignment from the old bank), in holding it for the whole instead of a part of the indebtedness of Clinton, and this furnished a good consideration between Clinton and the bank, and so far as the rights of the plaintiff as surety upon a portion of the debt were involved, the bank was bound to fulfill the obligations which the arrangement imposed. They were obliged to preserve the security unimpaired, so as to make it available to pay the debt, or in the event of payment by the surety, so that he could have the benefit of it for his own indemnity. (3 Kent's Com., 124.) The arrangement was not a mere substitution or renewal of the old securities, but it was a release of the old and a giving of new securities upon a new and different agreement, by which the rights of the plaintiff attached as soon as made. I think the Second National Bank had, in equity, a good title to the old bonds and mortgages, and had a right to enforce them for the purposes for which they were delivered to the old bank, and when it released them it incurred the liability incident to the position of trustee, but this does not affect the rights of the plaintiff secured by the new agreement. *Page 502 
When W.F. Leonard purchased of the bank the obligations of Clinton, and received a transfer of the collateral securities, he occupied precisely the same position toward the plaintiff that the bank did. Even if the firm of Leonards, instead of one of them, had made the purchase, they could have acquired against him no additional rights. Their rights and his, in the collaterals, were equal in degree, and differed only in the amount of their respective liabilities, and their rights could not be changed by the transfer. Under the finding of fact before referred to, it is manifest that any equitable claim which they may have, growing out of their interest in the old securities and the release of them, is enforceable against the bank and not against the plaintiff, and this covers the whole point of the principal litigation.
It is urged, with plausibility and considerable force, that the plaintiff could acquire no rights against the Leonards in the collaterals, by the wrongful act of the creditor in substituting securities. The answer to this is, that if the bank committed the wrongful act claimed against the Leonards, they were released from liability as sureties to the extent of the injury, by the change of collaterals, and they would have no occasion and no interest to litigate with the plaintiff, as their interests would not collide, and if such act was not committed, or if it has been waived, they have no reason to complain. The plaintiff claims through the bank in the sense of having a right, secured by an agreement which the latter had the power to make with his principal, but not in the sense of holding a title to such right, subject to any equities of the Leonards. The latter cannot insist upon their liability as sureties after being released by the act of the creditor, for the purpose of defeating the plaintiff's rights. We think the transaction is in no respect different than if mortgages had been taken upon other property, or other securities taken under the new agreement.
It is made a question whether interest could be collected upon the mortgages and applied upon the principal debt. *Page 503 
It is insisted that, as interest was paid from time to time upon the principal debt, it necessarily extinguished the interest upon the collaterals. The Special Term found that the bonds and mortgages "were intended by the parties to be a continuing, interest bearing, accumulating collateral security." We think the circumstances justified this finding. The form of the securities is a circumstance. The Special Term may have inferred that the parties understood that the interest upon bank paper, which constituted the principal debt, was payable in advance, and would not accumulate, and yet the bonds and mortgages expressly provided for interest, and the debts were not specified. Another material fact is, that the bonds and mortgages were for a less sum than the principal debt by more than $5,000, and it is fairly inferable that the parties intended that the interest should accumulate to cover the deficiency, or a portion of it, according to the terms of the instrument. If the bonds and mortgages had been existing securities in the hands of Clinton, and assigned by him to the bank, there would have been no doubt but that the interest would have been applicable to the payment of any part of the principal debt. (Edwards on Bailments, 240.) Nor can there be any question that it is competent for a debtor to give such a security directly to the creditor, and if so, it is difficult to conceive any better mode to accomplish it than was adopted in this case. The defendant Leonard was, therefore, entitled to enforce the mortgages for the whole amount, including interest, and as it appears, affirmatively, that he might have realized the full amount of the $30,000 mortgage at the foreclosure sale, he should account with the plaintiff in this action for that amount. As to the $5,000 mortgage, it is found that the foreclosure was regular, and that he acted in good faith, and he was properly charged only with the amount realized on the foreclosure sale.
The defendant Spalding cannot be protected as a purchaser, against the accumulated interest upon the large mortgage, for the reason that he is chargeable with notice of its contents *Page 504 
and its legal effect, which the statement of Clinton could not change or impair.
The judgment must be affirmed.
All concur.
Judgment affirmed.